UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:11-CR-0299-B |
| | § | |
| ANTONIO BENITEZ-VERGARA, | § | |
| | § | |
| Defendant. | § | |

# MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Suppress Evidence (doc. 28). A hearing was held on the Motion on September 7, 2012. For the reasons stated below, the Court finds the Motion should be and hereby is **DENIED** (doc. 28).

## I.

## BACKGROUND[1]

Defendant Antonio Benitez-Vergara ("Benitez") is charged with illegal reentry after removal from the United States, in violation of 8 U.S.C. § 1326(a), (b)(2); being an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(A)(2); being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and a forfeiture count under 18 U.S.C. § 924(d), 28 U.S.C. § 2461(c). Doc. 9, Indictment 1-4. This matter is set for trial on October 15, 2012. A summary of the evidence from the hearing follows.

---

[1]Unless otherwise noted, the Court takes its factual account from the evidence presented at the hearing held September 7, 2012. Defendant Benitez, Agent Bick, Officer Griffin, and Agent Gard testified at this hearing. Although the parties initially indicated that they agreed to the underlying facts, as it turned out, they did not and provided conflicting testimony at the hearing. The Court's credibility determinations and resolutions of conflicting testimony are set forth in this opinion.

The events leading to Benitez' arrest occurred in Dallas, Texas on the evening of September 17, 2011. ICE[2] received information that Benitez had unlawfully reentered the United States following his prior felony conviction for drug trafficking and subsequent removal and that he was residing at 9318 Fireside Drive. At 6:40 a.m., four ICE agents, accompanied by four Dallas Police Department (DPD) officers, arrived the residence to locate and arrest Benitez.

Six agents and officers of ICE and the DPD surrounded the home while ICE Agent Gard and a DPD officer went to the front door. Agent Gard knocked or rang the doorbell and was eventually greeted by Leticia Ornelas, Benitez' wife. Agent Gard began to speak with Ornelas, but Ornelas indicated that she did not understand English. ICE Agent Bick, who had been positioned near the rear of the home, was radioed to return to the entrance of the house to speak with Ornelas in Spanish. Agent Bick arrived, identified himself as "police," and asked if the officers could enter the home to speak with Ornelas. According to Bick, Ornelas immediately responded "yes, yes." Agents Bick and Gard stepped just inside the front door, and Agent Bick asked Ornelas whether there were any other adults in the home, to which Ornelas replied that only she and her children were in the home. Agent Bick testified that he then asked Ornelas whether the officers could search the home "for any other adults" and that Ornelas responded "yes, yes." The officers were then called to enter the residence and initiate the search.

The officers testified that Benitez was not visible when they entered the home. DPD Officer Griffin testified that he and one other DPD officer went up the stairs to the second floor of the home to search for Benitez and any other human "threat." Officer Griffin searched two bedrooms for places

---

[2] "ICE" refers to the United States Immigration and Customs Enforcement Agency.

where an adult could hide, including around and under the beds and in the bedroom closets. In the second bedroom, Officer Griffin found a gun box belonging to a rifle and what appeared to be rifle ammunition laying out in plain view on a shelf of the closet and on top of a dresser.

While Officer Griffin searched upstairs, Agent Bick searched the downstairs area and, according to his testimony, quickly arrived at the master bedroom. At or near the bedroom door, Agent Bick came face-to-face with a male who later identified himself as Benitez. Bick demanded that Benitez show his hands, and asked him his identity. Benitez then conceded his identity to Bick. Agent Bick next escorted Benitez to the living room and informed the other ICE agents via radio that he had secured their target. Because the DPD officers were not connected to the ICE agents' communication system, another agent or officer yelled upstairs to Officer Griffin and the other DPD officer to end the search.

Officer Griffin testified that he discovered the gun box and ammunition prior to being informed that Benitez had been found. Upon learning Benitez had been located, Officer Griffin further testified that he immediately ended his search and returned to the downstairs living area. He then informed Agent Bick that he had found a gun box in the upstairs bedroom. Agent Bick testified that he then asked Benitez whether there were any weapons in the house, and Benitez responded that there was one gun belonging to a family member that was located upstairs. After officers were unable to locate the gun, Benitez and his wife led the officers to the gun's location in the master bedroom. The gun was secured, and Benitez was read his *Miranda* rights. Thereafter, Ornelas led officers to three other firearms, and officers found an additional firearm in plain view.

Agent Gard contacted a supervisor, who then sent ICE Agent Deal to the residence. Agent Deal spoke with Agent Bick about the specifics of the search. He then asked Ornelas and Benitez

to consent to a further search of the home. They refused. Agent Deal prepared a search warrant affidavit containing facts gleaned from his discussion with Agent Bick. The search warrant affidavit claimed that the ICE agents had received Ornelas' "consent to search the residence for Benitez." Def.'s Ex. 1, Deal Aff. at 3.

After obtaining the search warrant and continuing their search, officers found a sixth firearm. Benitez was taken into ICE custody and charged with illegal reentry after removal from the United States, in violation of 8 U.S.C. § 1326(a), (b)(2); being an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(A)(2); being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and a forfeiture count under 18 U.S.C. § 924(d), 28 U.S.C. § 2461(c). Doc. 9, Indictment 1-4.

Benitez filed the instant Motion to Suppress (doc. 28) on July 31, 2012. The Government filed its Response (doc. 29) on August 17, 2012. A hearing was held on the Motion on September 7, 2012. Having considered the parties' briefing, the testimony at the hearing, and the relevant law, the Court now turns to the merits of its decision.

## II.

## LEGAL STANDARDS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Typically, searches conducted without prior judicial approval are considered unreasonable, subject to a limited number of "specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). An individual's consent to search her home is one such "well-established exception to the Fourth Amendment's warrant requirement." *United States v. Mata*, 517 F.3d 279,

290 (5th Cir. 2008); *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991). The Government bears the burden of establishing the reasonable nature of a warrantless search under the Fourth Amendment. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005); *United States v. Wallen*, 388 F.3d 161, 164 (5th Cir. 2004). If a challenged search is found to violate the Fourth Amendment, the exclusionary rule may preclude the admission of any evidence obtained through the search. *United States v. Leon*, 468 U.S. 897, 908-09 (1984).

## III.

## ANALYSIS

Benitez raises several arguments supporting his contention that the firearms and other contraband obtained during the warrantless search and following the issuance of the warrant should be suppressed. Benitez first argues that Ornelas' consent to search the residence was involuntary or, alternatively, that the officers exceeded the scope of her consent. Benitez next contends that his statements admitting the presence and location of the first discovered firearm were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Consequently, Benitez challenges the validity of the search warrant, which was obtained based on information received during the alleged unlawful search, seizure, and questioning. Finally, Benitez maintains that the officers violated Federal Rule of Criminal Procedure 5(a) when they failed to timely bring him before a magistrate judge. The Court will address each issue in turn.

A.  *Voluntariness of Consent to Search*

Benitez admits that Ornelas consented to a search of her home, but contends that her consent was involuntarily given. Consent must be free and voluntary to justify warrantless searches and seizures. *Mata*, 517 F.3d at 290. The Court considers six factors to determine whether a consent

to search was voluntarily given under the totality of the circumstances: "(1) the voluntariness of the [individual's] custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the [individual's] cooperation with the police; (4) the [individual's] awareness of his right to refuse to consent; (5) the [individual's] education and intelligence; and (6) the [individual's] belief that no incriminating evidence will be found." *Id.* (citing *United States v. Mendez*, 431 F.3d 420, 429 (5th Cir. 2005)).

Agents Bick and Gard's credible testimony established that Ornelas' consent was voluntary. Both agents stated that Ornelas appeared calm, polite, and cooperative when conversing with Agent Bick and granting consent to search the residence. Ornelas did not hesitate in responding in the affirmative to Agent Bick's request to enter the home and the subsequent request to search the home. The agents also testified that no weapons were drawn, Ornelas was not taken into custody, handcuffed, or otherwise detained, the officers stood approximately five feet away from her in the open entryway, and agents did not ask her immigration status (indeed, they were not aware at the time that she too was an illegal alien) or threaten her in any other way. Although Ornelas could not speak English, her conversation with Agent Bick was conducted in her native Spanish language. In addition to his credible testimony on direct and cross-examination, Agent Bick, in response to questions by the Court, convincingly depicted Ornelas' consent to search as voluntary, In sum, the Court finds the agents' testimony to be credible and, accordingly, determines that Ornelas' consent was voluntary and affirmative.

Benitez attempts to argue the involuntariness of Ornelas' consent by pointing to the fact that Ornelas was an unlawful alien and could have been detained, essentially intimidating her into submission. Doc. 28-1, Def.'s Br. 8. His efforts in this regard are unavailing for a number of reasons.

First, although Benitez' testimony was confusing and inconsistent as to exactly where he was when the officers entered the home, Benitez did not claim to have seen or heard the agents conversing with Ornelas regarding her consent to search. Additionally, the testimony at the hearing established that the agents did not question Ornelas' immigration status and only identified themselves as "police," not as immigration agents. Thus there is no evidence that Ornelas would have reason to believe that she was being detained or that such detention was based on her own immigration status. Moreover, despite Ornelas' alleged limited education, Benitez has failed to present evidence that Ornelas suffers from any mental limitation that would inform the Court of the involuntariness of her consent.

Benitez also contends that Ornelas' consent was invalid because she was never informed of her right to refuse consent. Doc. 28-1, Def.'s Br. 8. However, Ornelas did exercise her refusal to consent to a further search later in the day. Her refusal to consent to the later search undermines Benitez' argument that Ornelas was unaware of her right to refuse consent when she consented to the initial search. *See United States v. Elkins*, 300 F.3d 638, 648 (6th Cir. 2002).

Finally, Benitez' overall credibility and consequently the strength of his argument on the consent issue suffered due to his inconsistent and sometimes implausible testimony. For example, as mentioned, Benitez gave conflicting testimony as to his whereabouts at the time the officers entered the home. At one point, Benitez testified that he followed his wife to the front door and immediately encountered the agents there. That account, however, is uncorroborated and conflicts with the agents' more credible testimony and Benitez' own later admission that he remained in the master bedroom when the agents began their search. Furthermore, Benitez alleged that he was sleeping prior

to the officers' arrival, yet he was inexplicably found with a several thousand dollars[3] in the pocket of the shorts he was wearing. He also gave conflicting reasons as to why his wife, and not he, answered the front door. For all of these reasons, the Court assigns little weight to his testimony.

In sum, given the totality of the circumstances including the credible testimony of Agents Bick and Gard, the Court finds that Ornelas' consent was voluntarily given.

B.  *Scope of Consent to Search*

Benitez next argues that the officers exceeded the scope of the search consented to by Ornelas–which Benitez maintains was limited to a search for him–when they searched areas other than the master bedroom, including the upstairs, and when the officers allegedly continued to search the home even after Benitez was found. Doc. 28-1, Def.'s Br. 9-10. Conflicting evidence was presented as to Agent Bick's precise request for Ornelas' consent to search and to the timing of both the search for Benitez and the discovery of the contraband.

Agents Bick and Gard testified that Agent Bick asked and received from Ornelas her consent to search the residence for "any other adults." Agent Bick's written report similarly indicates that Agent Bick requested to search for "any other adults." Gov't Ex. 1, Form I213 at 2. However, Agent Deal's affidavit attached to the search warrant indicates that Ornelas only gave "consent to search the residence for Benitez." Def.'s Ex. 1, Deal Aff. at 3. Benitez points to the affidavit as conclusive evidence that the search was in fact limited to looking for "Benitez." The Government counters that the affidavit presents a mere summary of Agent Bick's discussion with Ornelas and does not purport to represent the precise language used at the time of the search to delineate the scope of the search.

---

[3]The evidence showed that Benitez had either six or eight thousand dollars in his pocket.

In resolving the conflict, the Court credits the first-hand testimony of Agents Bick and Gard that Ornelas granted consent for the officers to search the entire home for "any other adults." Officer Griffin credibly testified that he discovered the gun box and ammunition while searching for adults and prior to learning that Benitez had been found. Nonetheless, given that the scope of the search was for "any other adults," Officer Griffin would have been within the permissible scope even if he had continued to search the home for other adults after learning that Benitez was caught. The fact that the officers actually ended their search once they were notified of Benitez' location does not, in this Court's view, undermine the credibility of Bick and Gard's testimony regarding the original scope of consent given by Ornelas. In short, given the Court's opportunity to hear the detailed, first-hand testimony by Bick and Gard and to assess their credibility, the Court attaches no material weight to Deal's second-hand, conflicting affidavit.

Even if Ornelas consented to a search confined to locating Benitez, the credible testimony by Officer Griffin demonstrates that *when* and *where* he found the gun box and ammunition was reasonably within the scope of a search for Benitez alone. Specifically, Griffin found the gun box and ammunition during his search for Benitez. Officer Griffin found this evidence in an upstairs bedroom closet, a location reasonably within the scope of a search limited to finding Benitez, and he found it prior or simultaneous with being informed that Benitez had been found. Specifically, Griffin testified that he found the gun box and ammunition shortly after he arrived in the upstairs hallway, which, based on his credible rendition of events, was at nearly the same time that Agent Bick located and identified Benitez. Thus, given that the location where the gun box was found was reasonably within the scope of a search for Benitez and given that the timing of Officer Griffin's discovery of the evidence was almost simultaneous to finding Benitez, it is reasonable to conclude that the officers

did not exceed the scope of consent to search the residence even if it had been limited to looking only for Benitez.

Finally, Benitez argues that the search should have been limited to the master bedroom, because Officer Bick witnessed a male silhouette in that room prior to arriving at the front door and, therefore, should have known that Benitez was located in the master bedroom. This argument is easily dismissed. First, by the time Officer Bick was called to the front entrance of the residence, spoke with Ornelas, and began his search, the male suspect could have moved to another location within the house. Second, Ornelas did not limit the officers' search to only the master bedroom, so the officers were free to infer that the search was of the entire home. *See Mendez*, 431 F.3d at 427 ("It is the defendant's responsibility to limit the scope of the search if he so intends.").

Accordingly, the Court finds that the officers did not exceed the scope of Ornelas' consent during their search.

C.  *Miranda* Violation

Agent Bick learned that Officer Griffin found a gun box and ammunition and immediately asked Benitez whether there were any firearms in the residence. Benitez replied in the affirmative and led officers to the first firearm. Benitez contends that his responses were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), because they were elicited prior to the reading of his right against self-incrimination.

It is well established that an individual must be warned of certain rights prior to being asked questions that are likely to elicit inculpatory statements. 384 U.S. 436. Consequently, *Miranda* requires the "suppression of statements stemming from custodial interrogation in which the defendant is not apprised of his rights." *United States v. Brathwaite*, 458 F.3d 376, 382 (5th Cir.

2006). However, the Supreme Court has carved out numerous exceptions to *Miranda*, including an officer's right to ask questions to an un-*Mirandized* individual to ensure the officer's safety. *See New York v. Quarles*, 467 U.S. 649, 655-58 (1984); *Fleming v. Collins*, 954 F.2d 1109, 1113-14 (5th Cir. 1992) (en banc). Thus, "when the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may without informing him of his constitutional rights ask questions essential to elicit information necessary to neutralize the threat to the public." *Berkemer v. McCarty*, 468 U.S. 420, 429 n.10 (1984). The Court must consider the exigent circumstances confronting the officers and determine whether their questions were based on an objectively reasonable fear for their own safety, thus excusing the failure to Mirandize. *See United States v. Yanez*, 490 F. Supp. 2d 765, 772-73 (S.D. Tex. 2007).

The agents credibly testified that the existence of the gun box and ammunition alerted them to the possibility that firearms were located within the home. They also noted that the home was large, there were multiple cars in the driveway, and that the agents had ended their search of the home upon learning of Benitez' capture. The agents therefore were reasonably concerned that other adults might be hiding in rooms or areas that had not yet been searched. Moreover, Agent Bick observed that Ornelas' statement that no other adults were in the home had been proven false by the presence of Benitez. The existence of an empty gun box and ammunition, coupled with the fact that agents suspected that other adults remained in the home, caused the agents to be concerned for their safety. *See Quarles*, 467 U.S. at 657-59 (explaining that officers were reasonable to question a suspect as to the whereabouts of firearm, when they noticed that the suspect's holster was empty and feared that a potential accomplice might make use of it). Accordingly, the Court finds that Agent Bick was justified in immediately questioning Benitez about the presence of firearms prior to

reading him his *Miranda* rights. Such action was clearly reasonable to ensure Agent Bick's safety and the safety of the other officers around him, given the exigent circumstances that existed at the time.

D.   *Validity of Search Warrant*

Benitez challenges the validity of the later-obtained search warrant on the sole basis that the initial five weapons found by the officers were the product of an unlawful search and seizure. Doc. 28-1, Def.'s Br. 14-15. Because the Court rejects Benitez' contentions with respect to the lawfulness of the warrantless search and questioning, Benitez' challenge to the search warrant likewise fails.

E.   *Violation of Federal Rule of Criminal Procedure 5(a)*

Finally, Benitez argues that Federal Rule of Criminal Procedure 5(a) was violated when agents questioned him about the presence of weapons in the house prior to bringing him before the nearest federal magistrate judge. Doc. 28-1, Def.'s Br. 12. Benitez points to the Rule's requirement that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a). When evidence is obtained in violation of Rule 5(a), the Court may exclude it. *Corley v. United States*, 556 U.S. 303, 308 (2009); *Mallory v. United States*, 354 U.S. 449 (1957); *McNabb v. United States*, 318 U.S. 332 (1943).

Benitez' argument fails for two reasons. Most importantly, Rule 5(a) applies to criminal arrests and not civil immigration arrests, as occurred in this case. *See United States v. Dyer*, 325 F.3d 464, 470 (3d Cir. 2003); *United States v. Noel*, 231 F.3d 833, 837 (11th Cir. 2000). Second, even assuming Benitez' arrest was criminal in nature, Congress has provided a six-hour "safe harbor" time period for questioning an individual in custody prior to bringing that individual to a magistrate judge. 18 U.S.C. § 3501(c). Benitez was questioned by officers about the whereabouts of firearms mere moments after he was detained–well within the presumptively reasonable six-hour time period.

Accordingly, the officers did not violate Rule 5(a).

## IV.

## CONCLUSION

In conclusion, the Court finds that Ornelas' consent to search the residence was voluntary and that the officers did not exceed the scope of that consent in conducting their search. Benitez did not suffer a violation of his *Miranda* rights, because the officers were permitted to question Benitez regarding the presence of firearms to ensure their safety. Consequently, the subsequent search warrant is not invalidated on the basis of the search, seizure, and questioning. Further, the Court finds that Rule 5(a) is not implicated in this case. Accordingly, the Court finds Defendant's Motion to Suppress Evidence should be and hereby is **DENIED** (doc. 28).

**SO ORDERED.**

**DATED September 11, 2012.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE